## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARTHA SEVILLA, Independent** | ) | |
| **Administrator of the Estate of** | ) | |
| **MARIA QUINTANA, Deceased,** | ) | |
| | ) | **No. 10 C 8165** |
| **Plaintiff,** | ) | |
| | ) | **Judge Kendall** |
| **v.** | ) | |
| | ) | **Magistrate Judge Cole** |
| **THE UNITED STATES OF AMERICA** | ) | |
| **d/b/a ACCESS COMMUNITY HEALTH** | ) | |
| **NETWORK, et al.,** | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

Maria Quintana underwent an elective total hysterectomy at Mount Sinai Hospital on October 13, 2008. During the surgery, Ms. Quintana's bowel was lacerated and its contents began leaking into her abdomen. Five days later, she died from an overwhelming infection. Ms. Quintana is survived by her husband and four children. Her estate has sued the United States under the Federal Tort Claims Act ("FTCA") since one of her surgeons, Dr. Maryam Siddiqui, was employed by the United States. The estate has also named Mount Sinai Hospital Medical Center of Chicago, ("MSHMCC") as a defendant, as well as various physicians and a physician foundation group for failing to timely diagnose and treat Ms. Quintana's post-operative infection. The Administrator of the estate sought discovery of statements made by physicians in any peer review meetings regarding the surgery.[1]

---

[1] As used in this case, peer review is the process of evaluation and monitoring of qualifications and skills of physicians by their colleagues with whom they practice in a particular health care facility. *See Marrese v. Deaconess Hospital,* 956 F.2d 1466 (7th Cir. 1992); *Kopolovic v. Shah,* 2012 WL 844653, 5 (Ill.App. 2d Dist.).

In response to Interrogatory #10, which sought the identity of persons with knowledge of the facts of the medical care and treatment provided to Ms. Quintana, the United States listed two physicians, Dr. Thomas Vargish, Chairman of the Department of Surgery, Mount Sinai Hospital and Dr. Charles Lampley, a physician with Access Community Health Network, the federally funded health clinic that employed Dr. Siddiqui. But, the United States objected to the production of any evidence from these two witnesses, citing the Medical Studies Act, 735 ILCS 5/8 - 2101 *et seq.* ("IMSA"), which makes such information privileged. Similarly, in response to Interrogatory #14, the United States objected to any discovery of statements made by Dr. Siddiqui at an alleged peer review proceeding held at Access Community Health Network based on the Medical Studies Act.

After reviewing the discovery the United States did produce, plaintiff requested clarification of the privileges asserted and a privilege log. The United States then identified a four-page document it has described as a "Peer Review Case Report" from a peer review meeting held at Access Community Health Network. (*Motion to Compel*, Ex. B, September 6, 2011 letter from Assistant Attorney General Kurt Lindland). In response to Interrogatory #10, Mount Sinai identified a January 14, 2009 Peer Review Meeting at its medical center, but objected to discovery of any "discussions" at the meeting on the basis of the Medical Studies Act. In response to Interrogatory #15 and Request to Produce #13 and #25, Mount Sinai identified a one-page document constituting the minutes of the January 14, 2009 peer review meeting and has, like the United States, invoked the IMSA to withhold it from discovery. (*Motion to Compel,* Ex. C, Mount Sinai's Answers to Plaintiff's Interrogatories; Ex. D, Mount Sinai's Answers to Plaintiff's Request for Production).[2]

---

[2] The estate initially argued that the defendants had not shown that there had been a peer review. The defendants submitted affidavits to clear that up in their responses, and the estate, apparently satisfied, has abandoned its argument in its reply brief. If that was not the intent, the argument is nonetheless waived, for
(continued...)

## A.

Whether a privilege for medical peer review materials should be recognized in FTCA cases involving medical malpractice is an issue on which the courts are divided. A number have applied a privilege, while others – perhaps the numerical majority – have refused to do so. *See Francis v. United States,* 2011 WL 2224509, 6 (S.D.N.Y.2011)(collecting cases); *KD ex rel. Dieffenbach v. United States,* 715 F.Supp.2d 587, 592 (D. Del.2010)(collecting cases). All agree, however, that Rule 501 of the Federal Rules of Evidence provides the framework for analysis:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Rule. 501. *See Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1245 (7th Cir. 1995); *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981).

The principal claim here is brought under the FTCA; the defendants, other than the United States, have been joined pursuant to supplemental jurisdiction. That does not, however, affect the analysis of the privilege question. *See Virmani v. Novant Health Inc.*, 259 F.3d 284, 287 (4th Cir. 2001); *Shadur*, 664 F.2d at 1061 (pendent state law claims did not require different result as "it would be meaningless to hold the communication privileged for one set of claims and not the

---

[2](...continued)
"[f]ailure to respond to an argument . . . results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). *See also Gonzalez-Servin v. Ford Motor Co.* 662 F.3d 931, 933 (7th Cir. 2011); *United States v. Vrdolyak,* 593 F.3d 676, 691 (7th Cir. 2010).

other.").

In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court recognized a psychotherapist-patient privilege under Rule 501. The Court interpreted Rule 501's "reason and experience" phrase to mean that federal law will recognize a privilege that "'promotes sufficiently important interests to outweigh the need for probative evidence....'" *Id.* at 9-10. To that end, the asserted privilege: (1) must be "'rooted in imperative need for confidence and trust,'" and (2) "'must also serv[e] public ends." *Id.* at 10-11. (Brackets in original). Finally, the Court observed that the policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one. *Id.* at 12-13. After all, "state legislatures are fully aware of the need to protect the integrity of the factfinding functions of their courts" and a "State's promise of confidentiality would have little value if the [individuals it protects] were aware that the privilege would not be honored in a federal court." *Id.* at 13. As discussed below, all these criteria are satisfied by application of a peer review privilege in FTCA cases.

In the Seventh Circuit, the matter is not *res integra.* In *Memorial Hospital v. Shadur*, *supra*, the court examined at length the application of the IMSA in a federal question case. While the case was decided before *Jaffee*, the Court of Appeals anticipated and emphasized the same points that would underlie the Supreme Court's opinion in *Jaffee*, beginning with recognition of the importance of legislative judgments as expressed in state law. It noted that while the question of whether a privilege applies in a federal question case is governed by federal common law and reason and experience, "that does not mean . . . that federal courts should not consider the law of the state in which the case arises in determining whether a privilege should be recognized as a matter of federal law." *Shadur,* 664 F.2d at 1061. The court recognized that the "strong policy of comity between

4

state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Id.* (quotation omitted). After all, if a state held out "the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule." *Id.* (quotation omitted).

The court went on to caution that since privileges served "'to exclude relevant evidence and thereby block the judicial fact-finding function,'" they are not favored and, where recognized, must be narrowly construed. *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)). Also, in deciding whether the privilege asserted should be recognized, the Seventh Circuit acknowledged that it was essential to take into account the particular facts of the case in which the issue arises. *Shadur,* 664 F.2d at 1064. That meant "weigh[ing] the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Id.* at 1061-62.

The Seventh Circuit presciently emphasized the vital role peer review plays in achieving the vital public good of protecting the health of the citizenry – an interest the Supreme Court fifteen years later in *Jaffee* would recognize as "transcendent." *Jaffee,* 518 U.S. at 11 ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance."). And Congress, in enacting the Healthcare Quality Improvement Act of 1986 ("HCQIA") and the Patient Safety and Quality Improvement Act of 2005 (the "PSQIA"), 42 U.S.C. § 299b–21 *et seq.,* has also recognized that medical malpractice and the need to improve the quality of medical care are matters of overarching national importance. *See* 42 U.S.C.A. § 11101(1); *Virmani*, 259 F.3d at 291; *Francis v. United States,* 2011 WL 2224509; and discussion *infra* at, insert.

The court in *Shadur* quoted, with approval, *Bredice v. Doctor's Hospital*, 50 F.R.D. 249 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C.Cir. 1973)(Table), which, like the instant case, was a malpractice action and which extended qualified privilege to the minutes and reports of a hospital review committee. The court's assessment of the need for confidentiality of peer review materials in medical malpractice cases bears repeating:

> Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a sine qua non of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.
>
> The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques. They are not part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures. The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable. This value would be destroyed if the meetings and the names of those participating were to be opened to the discovery process.

*Shadur*, 664 F.2d at 1062.    *See also KD ex rel. Dieffenbach,* 715 F.Supp.2d at 594, 598.

The legislatures in every state in the Nation have concluded that without a peer review privilege, physicians will be discouraged from participating in the full and frank expression of opinion that is essential if peer review is to fulfill its vital role in advancing the quality of medical care.  *See Botvinick v. Rush University Medical Center*, 574 F.3d 414, 419 (7th Cir. 2009); *Roach v. Springfield Clinic,* 157 Ill.2d 29, 40, 623 N.E.2d 246, 251 (1993); *Zangara v. Advocate Christ Medical Center,* 951 N.E.2d 1143, 1150 (Ill.App. 1st Dist. 2011); *Adkins v. Christie*, 488 F.3d 1324, 1330 (11th Cir. 2007); *Francis,* 2011 WL 2224509, at *6; *KD ex rel. Dieffenbach, supra*. *Cf. Virmani*, 259 F.3d at 291.  It was the unanimity of legislative opinion that the Supreme Court

stressed in *Jaffee* warranted recognition of a psychotherapist/patient privilege. 518 U.S. at 12. Denial of a peer review privilege in FTCA cases would frustrate irretrievably the state legislation that fosters confidential communications thought essential to the achievement of a public good of transcendent importance. Denial of the privilege would, moreover, ignore the considerations of comity between state and federal sovereignties that *Shadur* stressed were so essential to analysis under Rule 501 and which "impel" federal courts to recognize state privileges except where such recognition would impose a substantial cost to federal substantive and procedural policy. Recognition of the IMSA privilege in the limited setting of an FTCA medical malpractice case will not adversely impact any federal substantive interest. Conversely, refusing to recognize the privilege will adversely affect the expectation of protection that the citizens of Illinois are rightly entitled to. *Shadur*, 664 F.2d at 1061.

In the end, the Seventh Circuit in *Shadur* did not find Illinois' peer review privilege applicable because the case before it was an antitrust case, not a medical malpractice case, and thus the framework for analysis was not the same. *Shadur*, 664 F.2d at 1062. It was the abuse of the peer review process that was alleged to constitute the anti-competitive behavior, and without discovery of the peer review data, the plaintiff could not prove his claim. That situation differed, *toto caelo*, from a medical malpractice case since honoring the privilege in that context "will generally have little impact upon the plaintiff's ability to prove a meritorious claim. For the crucial issue in that type of case is not what occurred at the review proceeding, but whether the defendant was in fact negligent in his care and treatment of the plaintiff. . . .'what someone ... at a subsequent date thought of these acts or omissions is not relevant to the case.'" *Shadur,* 664 F.2d at 1062. In short, "'the exclusion of that information w[ould] not prevent the plaintiff from otherwise

7

establishing a valid claim.'" *Id.*[3]

## B.

While acknowledging *Jaffee* and *Shadur*, the plaintiff contends that the analytical framework

for the instant case is *University of Pennsylvania v. Equal Employment Opportunity Commission*,

493 U.S. 182 (1990). There, the Court refused to recognize an academic peer review privilege in

a Title VII case where the issue was discrimination in the granting of tenure to a university

professor. *Id*. at 185. Central to that holding was the fact that Congress had carefully weighed the

competing and irreconcilably clashing interests and had concluded that the burdens on academic

autonomy that might result from disclosure of academic peer review proceedings were outweighed

by the need to expose discrimination in tenure decisions in universities through the same

enforcement procedures applicable to other employment decisions under Title VII. *University of*

*Pennsylvania,* 493 U.S. at 193.[4] In that context, to borrow Learned Hand's famous phrase,

---

[3] The Supreme Court in *Jaffee* had similar thoughts about the trade-off involved in recognizing the psychotherapist privilege:

> In contrast to the significant public and private interests supporting recognition of the privilege, the likely evidentiary benefit that would result from the denial of the privilege is modest. If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. Without a privilege, much of the desirable evidence to which litigants such as petitioner seek access-for example, admissions against interest by a party-is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged.

518 U.S. at 11-12.

[4] Title VII obligates the EEOC to investigate a charge of discrimination to determine whether there is "reasonable cause to believe that the charge is true." 42 U.S.C. § 2000e-5(b) (1982 ed.). The Court emphasized that on their face, §§ 2000e-8(a) and 2000e-9 do not carve out any special privilege relating to peer review materials, despite the fact that Congress undoubtedly was aware, when it extended Title VII's coverage of the potential burden that access to such material might create. 483 U.S. at 191. The Court noted

(continued...)

Congress had to strike a "balance between the evils inevitable in either alternative." *Gregoire v. Biddle* 177 F.2d 579, 581 (2ⁿᵈ Cir. 1949).

In a medical malpractice case under the FTCA there is no comparable, competing national interest at stake, and thus no need to choose between the lesser of two evils. Recognizing a peer review privilege furthers the national interest in the protection of the health of the citizenry without compromising any competing and clashing interest, and does no more than require the plaintiff to prove his case with expert evidence unconnected to the peer review materials. That occurs routinely in cases tried throughout the country. The effect on the ultimate truth seeking function of a trial is thus "modest," at worst. *Jaffee*, 518 U.S. at 11-12. Not recognizing the privilege would inhibit the candor that is essential to effective peer review, *Shadur* at 1062, and thus frustrate the achievement of what is indisputably a national interest of overarching significance.

## C.

Cases in this district refute the plaintiff's contention that *Shadur* has been eclipsed by *University of Pennsylvania.* Perhaps the most cogent analysis is *United States v. United Network for Organ Sharing*, 2002 WL 1726536 (N.D.Ill. 2002), where Judge Moran emphasized the decisive distinction between cases in which recognition of a privilege merely precludes discovery of otherwise relevant, but not indispensable information, from those where the plaintiff cannot proceed without the information sought in discovery. Judge Moran phrased it this way: "When peer review materials are essential for proving a federal claim, such as discrimination in university tenure decisions, *University of Pennsylvania* . . . or antitrust violations, . . . *Shadur*, . . . discovery is

---

⁴(...continued)
that often, disclosure of peer review materials will be necessary in order for the EEOC to determine whether illegal discrimination has taken place. Indeed, if there is a "smoking gun" to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files. 493 U.S. at 193.

compelled." *Id*. at *1.   But in a medical malpractice claim under the FTCA, where the opinions of a peer review committee are not indispensable to prove the claim, the privilege may be recognized. 2002 WL 1726536 at *1. *Accord, Francis,* 2011 WL 2224509 at *5; *see also Gargiulo v. Baystate Health, Inc.,* 2011 WL 3627549, *4 (D.Mass. 2011).

   Relying on *Shadur,* Judge Moran also emphasized that all the states had recognized a peer review privilege in a hospital setting, and even though peer review documents are not protected by a federal privilege, "'[a] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.'" 2002 WL 1726536 at * 1.   Judge Moran did not apply the privilege in the case before him because it was a law enforcement case, and he felt constrained by *United States v. Morton Salt Co.*, 338 U.S. 632, 651 (1950), which held that law enforcement agencies have a right to satisfy themselves that corporate behavior is consistent with the law and public interest.   It is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant.

   Equally unsupportive of the plaintiff in the factual setting of this case is the Fourth Circuit's opinion in *Virmani, supra,* which was a race and national origin discrimination case.   As in *University of Pennsylvania* – and in *Shadur,* on which the Fourth Circuit relied, 259 F.3d at 291 – the critical evidence was to be found in the peer review proceedings.   The Fourth Circuit left no doubt of its agreement with the overriding importance of protecting peer-reviewed materials in the context of medical malpractice cases, where proof of the claimed wrongdoing was not dependent

on what occurred in the peer review process.[5]   But that analysis was not applicable where the evidence a plaintiff was seeking was crucial to establishing that he had been the subject of disparate treatment.   To prove those allegations the plaintiff had to "compare the proceedings in his case against those involving similarly situated physicians.   The interest in facilitating the eradication of discrimination by providing perhaps the only evidence that can establish its occurrence outweighs the interest in promoting candor in the medical peer review process." 259 F.3d at 289.[6]

While recognizing the significant role principles of comity play in determining whether a particular privilege should be recognized, the Fourth Circuit explained that those principles would not be offended by refusing to recognize the peer review privilege in the context of a discrimination case, since the limited purpose of the privilege is to advance the interests of society in the health and well being of its members.   *Id.* at 290-91.   *See also Adkins*, 488 F.3d at 1330; *Gargiulo*, 2011 WL 3627549, *4.   Obviously, principles of comity would be profoundly affected by refusing to

---

[5] The court cited with approval Charles David Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey,* 67 N.C. L.Rev. 179, 179 n. 4 (1988)("'A physician's qualifications, competence, and ethics all are called into question when a medical staff committee is requested to ... to assess the quality of his work. ... [C]ommittee participants may lose professional friends, as well as referrals, from physicians who receive unfavorable reviews. In addition, the committee members, and the hospital as well, may be exposed to costly litigation alleging defamation, the most common claim arising from committee activities."). *Virman*i, 259 F.3d at 291.

[6] There are any number of cases in which the peer review process itself is a vehicle through which a particular wrong has been accomplished.   *See e.g.,Summit Health, Ltd. v. Pinhas* 500 U.S. 322, 326-327 (1991)("when respondent refused to sign or return the sham contract, petitioners initiated peer review proceedings against him and summarily suspended, and subsequently terminated, his medical staff privileges."); *Patrick v. Burget,* 486 U.S. 94 (1988); *Marrese v. American Academy of Orthopaedic Surgeons,* 1992 WL 246906, 3 (7th Cir.1992); *U.S. ex rel. Roberts v. QHG of Indiana, Inc*., 1998 WL 1756728, 3 (N.D. Ind.1998)("Moreover, the information contained in the peer review materials sought by the Relators appears to represent the only source of evidence from which the Relators can establish actual knowledge on the part of the Defendants, an element of proof required by the False Claims Act."); *Teasdale v. Marin General Hosp.,* 138 F.R.D. 691 (N.D.Cal. 1991)(California's privilege against discovery for documents in proceedings of peer review bodies did not prevent physician from obtaining discovery of peer review documents in action challenging revocation of his hospital surgical privileges).

11

recognize the privilege in the very context in which it was intended to apply.

## D.

Only three of the cases the estate points to, which, in any event, would not be binding here, *see Wirtz v. City of South Bend*, _ F.3d _, _, 2012 WL 384861, *3 (7th Cir. 2012); *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009), were malpractice cases. *See*, *Syposs v. United States*, 179 F.R.D. 406, 412 (W.D.N.Y. 1998); *Tucker v. United States*, 143 F.Supp.2d 619, 626 (S.D.W.Va. 2001); and *Davila v. Patel*, 415 F.Supp.2d 528, 530 (E.D.Pa. 2005).[7] *Tucker* and *Davila* relied on *Syposs* and so we begin with it.

*Syposs* rejected a claim that it should recognize a federal common law privilege for hospital peer review materials. It seemed to read *University of Pennsylvania v. EEOC* as broadly refusing to recognize a federal common law privilege for "'peer review documents.'" 179 F.R.D. at 409. But the Court plainly did not mean to include within this phrase anything beyond academic peer review documents. Time and again the Supreme Court and the Seventh Circuit have warned against uncritically relying on general observations in opinions and against taking general language out of the factual context of its utterance. *Cohens v. Virginia*, 19 U.S. 264, 399 (1821)(Marshall, C.J.). "General expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Id.*[8] Indeed, "it is a disservice to judges and a misunderstanding of the

---

[7] The estate claims that *Schlegel v. Kaiser Foundation Health Plan*, 2008 WL 4570619 (E.D.Cal. 2008) was also a medical malpractice case. It wasn't. The claims, brought against a health care plan, sounded in breach of duty of good faith and fair dealing, breach of contract, negligence, fraud, misrepresentation , and infliction of emotional distress. 2008 WL 4570619, *1. As such, it relied extensively on *Adkins* – another non-malpractice case – to deny the application of the privilege, which, unlike the IMSA, was a much broader, general peer review privilege.

[8] *See also*, *Florida v. Bostick*, 501 U.S. 429, 435 (1991); *United States v. Apfelbaum*, 445 U.S. 115, 120 n.6 (1980); *Reiter v. Sonotone*, 442 U.S. 330, 341 (1979); *Zenith Radio Corp. v. United States,* 437 U.S.
(continued...)

12

judicial process" not to do so. *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006)(Posner, J.). Six years after *University of Pennsylvania* was announced, the Supreme Court carefully characterized its holding in that case as having involved a claim of "privilege against disclosure of *academic* peer review materials." *Jaffee*, 518 U.S. at 19 (emphasis supplied). Thus, *University of Pennsylvania* does not settle the issue in this case.

The court in *Syposs* also found support for its conclusion that medical peer review records are not immune from discovery in FTCA cases involving medical malpractice in Congress's not having made those records privileged in the Health Care Quality Improvement Act of 1986 ("HCQIA"). The Act provided qualified immunity for persons providing information to a professional review body regarding the competence or professional conduct of a physician. 42 U.S.C. § 11111(a)(1). However, Congress created an express exception to the immunity provision in the case of civil rights actions. *Virmani*, 259 F.3d at 291-292.

The HCQIA only made information reporting adverse actions taken against physicians to a national health-care-quality clearinghouse confidential. 42 U.S.C. § 11137(b)(1). Consequently, *Syposs* reasoned, "the absence of such a privilege in this statute is evidence that Congress did not intend [peer review] records [in FTCA medical malpractice cases] to have the level of confidentiality and protection advanced by the hospitals and provided in the state statute." 179 F.R.D. at 410.

Of course, courts should be especially reluctant to recognize a privilege in an area where it

---

[8](...continued)
443, 462 (1978); *Penry v. Lynaugh*, 492 U.S. 302, 358 (1989)(Scalia, J., concurring and dissenting in part)("One must read cases, however, not in a vacuum, but in light of their facts"); *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 118-199 (1993); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)(En Banc); *McCready v. Jesse White*, 417 F.3d 700, 702-703 (7th Cir. 2005).

appears that Congress has considered and weighed the competing considerations and has made a deliberate determination to reject a privilege because it would conflict with interests Congress deems more important than the interest subserved by the privilege. That is what the Supreme Court found had occurred in Congress' extension of Title VII. *University of Pennsylvania*, 493 U.S. at 189-90. Congress made no such deliberate and careful judgment in enacting the HCQIA of 1986, as the Fourth Circuit recognized in *Virmani*. There, the court was unwilling to affirm the district court, which – like some other lower courts – had concluded that Congress had considered and rejected a privilege for medical peer review materials when it enacted the HCQIA.[9]

While having no doubt that Congress determined that providing confidentiality protection to physicians on review committees was an interest subordinate to and inconsistent with allowing victims of discrimination to pursue their claims, the Fourth Circuit held that it "c[ould] not conclude that Congress actually considered and rejected a privilege for medical review materials when enacting the HCQIA...." *Virmani*, 259 F.3d at 291.

It is one thing for Congress to *reject* a privilege because it frustrates the achievement of a national goal that is deemed more weighty than a *competing* interest that might be advanced by recognition of the privilege. That is what occurred when Congress decided to extend Title VII. *See University of Pennsylvania, supra.* It is quite another not to create a privilege applicable in all settings that is complimentary to a privilege or remedy that Congress has established in a particular context. That is what occurred when Congress enacted the HCQIA, which accorded qualified immunity to reporting physicians and limited confidentiality to certain records. That is simply not

---

[9] The district court had relied on *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 560 (S.D.N.Y. 1996). *Syposs* had relied on that case as well. It would certainly appear that the Fourth Circuit on the narrow point raised on this case, would not approve of the reasoning of *Syposs*.

comparable to the situation with which Congress was confronted in Title VII and which the Supreme Court addressed in *University of Pennsylvania v. EEOC* .

In assessing the significance to be accorded the absence of a general peer review privilege in the HCQIA, several courts have concluded that "Congress spoke loudly with its silence." *Teasdale v. Marin General Hosp.,* 138 F.R.D. 691, 694 (N.D.Cal. 1991). (This is essentially what *Syposs* concluded as well). But inferences from silence are generally perilous, *United States v. Hale*, 422 U.S. 171, 176 (1975); *Coleman v. Interco, Inc. Division Plans*, 933 F.2d 550, 552 (7th Cir. 1991), and inferences from Congressional silence "are treacherous; oversights are common in the hurly-burly of congressional enactment; omissions are not enactments; and even deliberate omissions are often subject to alternative interpretations. . . ." *Alto Dairy v. Veneman ,* 336 F.3d 560, 566 (7th Cir. 2003)(Posner, J.).

Silence might signify something about the scope of a statute, but it equally might highlight an issue that Congress did not anticipate or that it chose to leave open. *Bayo v. Napolitano,* 593 F.3d 495, 501 (7th Cir. 2010). Thus, Congressional silence can be a dubious basis for statutory interpretation. *See e.g., Negusie v. Holder,* 555 U.S. 511, 518 (2009)(refusing to find Congressional silence "conclusive," merely because the statute did not provide for a particular exception); *McDonald v. City of Chicago*, _U.S._, 130 S.Ct. 3020, 3136 (2010); *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388 (2000); *United States v. Wells,* 519 U.S. 482, 496 (1997). The precepts of caution apply here.

"Legislation is impelled and addressed to concrete conditions deemed or demonstrated to be obstacles to something better. . . ." *Lower Vein Coal Co. v. Industrial Board*, 255 U.S. 144, 148 (1921). In enacting the HCQIA Congress was responding to a particular "national need," namely

the need "to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 1101(2). Congress found that this nationwide problem could be at least partly remedied through effective professional peer review. 42 U.S.C. §§ 1101 (3) and (5). However, the "threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. §§ 1101(3) and (4). Congress' solution to that perceived problem was to give qualified immunity to physicians participating in the peer review process.

That Congress did not create, in addition, a peer review privilege applicable, *semper ubique et ab omnibus*, is not surprising or meaningful. Congress often initiates reforms incrementally, taking "one step at a time," addressing itself to what is perceived as the "most threatening" or acute manifestation of a problem, and applying one remedy, while "neglecting the others." *United States. v. Morrison,* 529 U.S. 598, 631 (2000); *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993); *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 489 (1955). Moreover, there simply was no need for Congress in the HCQIA or the Patient Safety and Quality Improvement Act of 2005 ("PSQIA"), *see infra* at 18, to create an omnibus peer review privilege that would be applicable in FTCA cases tried in the federal courts since all 50 states and the District of Columbia have one – a fact of which Congress must have been aware.

The Supreme Court has emphasized that it is presumed that Congress is knowledgeable about existing law pertinent to the legislation it enacts, including state law. *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 185 (1988)(Congress was presumed to be aware of the substantial number of States providing additional workers' compensation awards). There was, then, hardly a need for

Congress in the HCQIA and the PSQIA to create an omnibus peer review privilege that would be applicable in FTCA medical malpractice cases. In short, the fact that Congress has not established a general peer review privilege is not significant.[10]

*Syposs* also concluded that a medical peer review privilege was unnecessary because there was "no reason to believe *some* physicians would not provide candid appraisals of their peers absent the asserted privilege." *Id.* 179 F.R.D. at 412(emphasis supplied). That may well be true. But it is not a basis upon which to conclude that a peer review privilege ought not be recognized in medical malpractice cases under the FTCA. There is every reason to believe that there are large numbers of physicians who would not be so intrepid. Indeed, "'[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision making process.'" *University of Pennsylvania*, 493 U.S. at 195. What Learned Hand said in the context of explaining the need for qualified privilege in civil cases applies equally in the context of medical peer review: "[Without a privilege,] the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties" would be "dampen[ed]." *Gregoire,* 177 F.2d

_____

[10] *Syposs* also adverted to 38 U.S.C. §5705, which provides that certain medical quality assurance records are privileged in cases involving hospitals operated by the Veterans Administration/Department of Veterans Affairs. By regulation, documents, such as "tort claims peer reviews," 38 C.F.R. § 17.501(a)(1)(ix), are included in this privilege. A similar privilege exists as to Defense Department health facilities. 10 U.S.C. § 1102. The court concluded that the failure of Congress to have enacted a peer review medical privilege in cases outside the few instances where it accorded records immunity from disclosure was "'evidence that Congress did not intend these records to have the level of confidentiality and protection advanced by the hospitals.'" 179 F.R.D. at 410. Even if true in the very limited context in which the particular statutes and regulations operated – and even that is unpersuasive for the reasons discussed above -- it simply does not follow that Congress made the kind of careful and balanced assessment of competing interests that it did in extending Title VII.

at 581.[11]  The Seventh Circuit has gone farther, concluding that if peer review discussions and deliberations were open to discovery, they would come to an end. *Shadur*, 664 F.2d at 1062.  And, of course, the legislatures in every state have determined that without a peer review privilege in medical malpractice cases, that candor and resolve necessary to meaningful peer review would be seriously compromised.

*Tucker* merely adopted the reasoning of *Syposs,* 143 F.Supp.2d at 626, and *Davila* simply followed *Syposs* and *Tucker*.  415 F.Supp.2d at  530.  None of these cases  are convincing here, given *Shadur* and the analysis in *Jaffee*.  Whatever may be the view in cases in other districts, judges in this Circuit must follow the decisions of the Seventh Circuit. *See Hart v. Wal-Mart Stores, Inc. Associates' Health and Welfare Plan*, 360 F.3d 674, 680 (7th Cir. 2004); *Gacy v. Welborn*, 994 F.2d 305, 311 (1993); *Thiel v. State Bar of Wisc.*, 94 F.3d 399, 404 (7th Cir. 1996); *Lindh v. Murphy*, 96 F.3d 856, 873 (7th Cir. 1996)(*en banc*); *Hunt v. Armour & Co.*, 185 F.2d 722 (7th Cir. 1950).  The Seventh Circuit has expounded at length on the value of and need for confidentiality in the medical peer review process in the context of cases like the one before me and the permissibility of recognizing that privilege in such cases.  I am not at liberty to ignore *Shadur*, and I would not come to a different conclusion were the decision mine in the first instance.

---

[11] The Court in *University of Pennsylvania* found that the claimed need for an academic peer review privilege was speculative, since confidentiality is not the norm in all peer review systems, and, some disclosure of peer evaluations would take place even if petitioner's special necessity" test were adopted. Thus, the "chilling effect" petitioner fears is at most only incrementally worsened by the absence of a privilege. 493 U.S. at  200. There is nothing speculative about the harm that will result to a transcendent public interest if the privilege involved in this case is not recognized.

18

## E.

Recent cases have found significant Congress' enactment of the PSQIA, 42 U.S.C. § 299b–21 *et seq.* The Act "announces a more general approval of the medical peer review process and more sweeping evidentiary protections for materials used therein." *Dieffenbach,* 715 F.Supp.2d at 595. The purpose of the PSQIA "is to encourage a 'culture of safety' and quality in the U.S. health care system by providing for broad confidentiality and legal protections of information collected and reported voluntarily for the purposes of improving the quality of medical care and patient safety." S.Rep. No. 108–196, at 3 (2003).

Specifically, the PSQIA creates a privilege for "any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements" that a health care provider assembles or develops and reports to a patient safety organization ("PSO") on a timely basis. 42 U.S.C. §§ 299b–21(7) and 299b–22(a). Congress intended the broad protection afforded by the Act to complement, not supplant, existing law providing for greater privilege. *See* 42 U.S.C. §§.299b–22(g). *See Dieffenbach,* 715 F.Supp.2d at 597 (concluding that a medical peer review privilege in an FTCA action for dental malpractice would advance Congress' goal of promoting peer review to improve quality of care).

## F.

One final point. *Davila*, barely a page in length, is significant only for the reason that the United States took the opposite position there that it does here because it wanted the documents. The estate pointed this fact out in its opening brief, without analysis and without advancing a

judicial estoppel argument. That came in its reply brief.[12] But that was too late. "A reply brief is for replying" not for raising essentially new matter that could have been advanced in the opening brief. *Hussein v. Oshkosh Motor Truck Company*, 816 F.2d 348, 360 (7th Cir. 1987)(Posner, J., concurring). The argument is thus waived. *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009)(arguments not fully developed until a reply brief are waived). *See also*, *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir.2006); *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010); *United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007); *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006); *Bodenstab v. County of Cook*, 569 F.3d 657, 658 (7th Cir. 2009); *United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007); *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004); *Wright v. United States*, 139 F.3d 551 (7th Cir. 1998). Even had the argument been advanced in the opening brief, I would not have found it dispositive given the significance of the issue, which transcends the immediate concerns of the parties.

## CONCLUSION

The policy interests behind the peer review privilege in medical malpractice cases, regardless of the forum in which they are tried, are as substantial as any that can be imagined: "Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations." *Shadur*, 664 F.2d at 1062. *See also Freeman v. Fairman*, 917 F.Supp. 586, 588 -589 (N.D.Ill.1996). The only consequence in not

---

[12] *See Reed Elsevier, Inc. v. Muchnick*,_U.S._, 130 S.Ct. 1237, 1249 (2010)(The "doctrine [of judicial estoppel] typically applies when, among other things, a party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.").

recognizing the privilege is to require the plaintiff in this case to do what plaintiffs in medical malpractice cases are routinely required to do in all other cases, namely adduce proof independent of what occurred in the peer review process.

The Motion to Compel [95 ] is DENIED.

DATE: 4/4/12                    ENTERED:_____
                                         UNITED STATES MAGISTRATE JUDGE